**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity; Sierra Club; WildEarth Guardians, | No. CV-09-8116-PHX-FJM |
| Plaintiffs, | **ORDER** |
| vs. | |
| United States Forest Service; United States Fish and Wildlife Service, | |
| Defendants. | |

The court has before it a motion for summary judgment by plaintiffs Center for Biological Diversity, Sierra Club, and WildEarth Guardians (doc. 16), defendants United States Forest Service ("Forest Service") and United States Fish and Wildlife Service's ("FWS") response and cross motion for summary judgment (doc. 24), plaintiffs' response and reply (doc. 31), defendants' reply (doc. 36), and the administrative record of both the FWS and the Forest Service. We also have before us defendants' motion to strike various declarations (doc. 28), plaintiffs' response (doc. 32), and defendants' reply (doc. 35).[1]

_____

[1]Plaintiffs filed declarations by Jay Lininger and Stacey L. Hamburg, ostensibly for standing purposes only, although no standing issues are raised. Plaintiffs also filed a declaration by Chad Hanson, which is concededly "extra-record evidence." Response at 1. Except for very narrow exceptions, our review of an agency's decision is limited to the

**I**

The Warm Fire was started by lightning on June 8, 2006, in the Kaibab National Forest and burned approximately 60,000 acres. This action challenges a project known as the "Warm Fire Recovery Project," which involves the rehabilitation and recovery of approximately 39,000 acres burned by the Warm Fire in the North Kaibab Ranger District. Specifically, the Project proposes to harvest fire-killed trees and reduce fuel loads for future fires on approximately 9,000 acres, and reforestation tree planting on approximately 10,000 acres. The Forest Service identified three "purposes and needs" for the Warm Fire Project: (1) recover economic value from burned timber, (2) reforest burned conifer stands, and (3) reduce fuel loads, while retaining sufficient standing dead trees ("snags") for wildlife habitat and woody debris to benefit soils. FS AR doc. 426 at 16939-41.

Of the 9,000 acres of burned land proposed for logging, 3,460 acres are in critical habitat designated for the Mexican Spotted Owl ("MSO"). In 2004, the MSO was listed under the Endangered Species Act as a threatened specie and critical habitat was designated, including land in the North Kaibab Ranger District. The Forest Service prepared an environmental impact statement ("EIS") regarding the Warm Fire Project and concluded that the Project is "not likely to adversely affect" the MSO. The FWS concurred in this determination.

Plaintiffs now challenge the decision to authorize the Warm Fire Project. They argue that (1) the FWS violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, by concurring with the Forest Service's determination that the Project is "not likely to adversely affect" the MSO; (2) the Forest Service violated the National Forest Management Act, 16 U.S.C. § 1604(i), and the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), in

administrative record. Center for Bio. Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006). These declarations do not fit within those narrow exceptions, but instead appear to be an attempt to circumvent the page limitations set by our briefing schedule (doc. 15). Therefore, we strike any non-standing averments in the Lininger and Hamburg declarations, and the Hanson declaration in its entirety.

analyzing potential effects of the Project on the Allen's lappet-browed bat; and (3) the Forest Service violated NEPA in determining the amount of woody debris to be retained in the Project area.

Our review of final agency actions under the Administrative Procedure Act, 5 U.S.C. § 706, is highly deferential.  We may not substitute our judgment for that of the agency. Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983). Instead, we may only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).  An agency's decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered no explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  State Farm, 463 U.S. at 43, 103 S. Ct. at 2867.

**II**

The Endangered Species Act is intended to protect and conserve endangered and threatened species and their habitats.  After a species is listed as endangered or threatened, federal agencies are required to ensure that their proposed actions will not jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2).  If a federal agency determines that a proposed action "may affect" listed species or critical habitat, consultation between the agency and the FWS is required. 50 C.F.R. § 402.14(a).  If "during informal consultation it is determined by the Federal agency, with the written concurrence of the [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a).

In the present case, the FWS agreed with the Forest Service's conclusion that the Project was not likely to adversely affect the MSO. FS AR doc. 399.  Given the lack of MSO sightings and because the Project Area was severely burned by the Warm Fire, the FWS determined that the MSO's occurrence in the Project Area was "extremely unlikely" and that

1  "any potential direct or indirect effects on individuals of the species are discountable." Id.

2  Plaintiffs argue that the FWS's concurrence was arbitrary and capricious and therefore

3  violated the ESA.

4                                                    A

5        Plaintiffs first contend that the FWS's conclusion that the Project is unlikely to affect

6  the MSO contradicts its previous conclusion that another project—the "Hazard Tree

7  Project"—*would* adversely affect the MSO.  Because the Hazard Tree Project is significantly

8  different from the Warm Fire Project, however, we do not agree that the two conclusions are

9  incompatible.

10       The Warm Fire Project was designed to rehabilitate post-fire habitat by leaving 5-7

11 large snags per acre, reforestation of burned areas, monitoring salvage areas for recovery of

12 MSO habitat, and incorporating salvage features in order to maintain habitat connectivity.

13 FS AR doc. 425 at 16363-64; FWS AR at 1309, 2486.  In contrast, the Hazard Tree Project

14 was designed to promote public safety, not to recover favorable MSO habitat conditions.

15 "Due to concern for public safety," the project was designed to remove *all* hazard trees

16 within 200 feet of the centerline of 82 miles roadways.  FWS at 1653.  Open fuel breaks and

17 safety corridors would be constructed throughout the project area.  Id. at 1661.  Accordingly,

18 the FWS recognized that the "[Hazard Tree] project will remove most of the key habitat

19 components that remain in the road and trail corridors," id., and therefore "MSO critical

20 habitat will be lost," id. at 1663.

21       The administrative record amply demonstrates the significant differences between the

22 purposes, design features, methodologies, and effects of the Warm Fire and the Hazard Tree

23 Projects.  Given these distinctions, we cannot say that the FWS's conclusions are

24 irreconcilable.  There is no obvious contradiction in the FWS's conclusion on the one hand

25 that the Hazard Tree Project's complete removal of trees in an 82-mile corridor will affect

26 MSO habitat, while the Warm Fire Project's limited removal of snags, combined with

27 reforestation and habitat management, will not.  This disparity does not support a conclusion

28 that the FWS's concurrence in the Warm Fire Project was arbitrary and capricious.

- 4 -

**B**

Plaintiffs also contend that the FWS's letter of concurrence ignored its own biologists' initial concerns and recommendations regarding the Project and did not adequately explain its change of position.  For example, on November 2, 2006, in its initial comments on post-Warm Fire activities, the FWS recommended that no logging occur in MSO habitat.  FWS AR at 828.  It also recommended that the Forest Service should retain key habitat components including large trees "to the greatest extent possible."  FS AR doc. 244 at 12239.  Again, in April 2008, the FWS recommended "significantly increas[ing] the amount of large [snags and logs] that will be left" onsite in order to promote recovery of key MSO habitat components.  FS AR doc. 372 at 14888.

The agencies engaged in a consultation process that lasted almost two years.  See, e.g., FWS AR at 1167-69, 1260-61, 2182-89.  On November 16, 2007, the Forest Service consulted with the authors of the MSO Recovery Plan, who confirmed that the proposed Warm Fire Project would not disturb the MSO, would not impede or compromise recovery, and would not conflict with the MSO Recovery Plan.  FWS AR at 1891; see also FWS AR at 3280 (stating that "in the vast majority of cases, actions in compliance with the Recovery Plan will be determined 'not likely to affect' owls or critical habitat and consultation will conclude informally").  The FWS explains that as a result of the deliberative process, and after further considering the views of its scientists, it modified its recommended criteria and no longer advised that salvage logging avoid MSO critical habitat.  FWS AR at 2215-17, 2322.  Before the conclusion of the consultation process, the Forest Service either adopted the FWS's recommendations or provided an explanation as to why a specific recommendation could not be met.  See FS AR at 16372 (plant more Douglas fir), id. at 16380 (no new roads will be constructed), id. at 16382 (monitor for erosion), id. at 16384 (monitor for invasive plants, defer grazing for two years), id. at 16391-92 (reject prescribed burns).

Federal courts "ordinarily are empowered to review only an agency's *final* action."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659, 127 S. Ct. 2518,

2530 (2007) (emphasis in original). Refinement and modifications of positions are a natural part of the deliberative process. An agency is entitled to change its mind as long as the proper procedures are followed. <u>Id.</u> The fact that a preliminary determination is later overruled during the course of consideration "does not render the decisionmaking process arbitrary and capricious." <u>Id.</u> While the FWS concurrence letter does not expressly describe the evolution of its position from its preliminary comments on the draft biological assessment and EIS until its final concurrence with the Forest Service, the administrative record sufficiently demonstrates that the Forest Service and FWS considered the advice of their scientists, describes the progression of the consultative process, and evidences the coordination and compromise incorporated in that process.[2]

## C

Finally, plaintiffs contend that in making its determination regarding the Warm Fire Project's potential effect on MSO, the FWS ignored its prior determination that the Project area is likely occupied by the owl. In its 2004 MSO critical habitat designation, the FWS concluded that the designated area, consisting of almost four million total acres in Arizona, was currently occupied by the MSO. 69 Fed. Reg. 53182, 53212-13 (Aug. 31, 2004) (stating that the designated critical habitat "are within the geographical area occupied by the species"). According to plaintiffs, this statement necessarily determines that MSOs likely occupy the specific Project area as well. Plaintiffs contend that the FWS's failure to reconcile its determination in 2004 that all of the critical habitat area is "within the geographical area occupied by the [MSO]," with its contrary conclusion in the 2008 letter of concurrence that it is "extremely unlikely" that MSO occur in the Warm Fire Project area,

---

[2]Plaintiffs rely on cases that address an agency's obligation to explain its departure from *formal* policies, standards or positions. <u>See</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm</u>, 463 U.S. 29, 42, 103 S. Ct. 2856, 2866 (1983); <u>County of Los Angeles v. Leavitt</u>, 521 F.3d 1073, 1078 (9th Cir. 2008); <u>Verizon v. FCC</u>, 570 F.3d 294, 301 (9th Cir. 2009). These cases do not support a conclusion that a similar explanation is required for a change of position during a consultation process.

1   renders its "not likely to adversely affect" determination arbitrary, capricious and in violation

2   of the ESA.  We are not persuaded.

3     The factors relevant to a critical habitat designation are distinguishable from those

4   used to determine the effects of a specific project on the MSO.  A critical habitat designation

5   "constitutes [an agency's] best assessment of areas that are essential to the conservation" of

6   the specie and broadly considers the physical and biological habitat features necessary for

7   the specie's conservation.  Id.  The MSO critical habitat analysis noted that MSO sightings

8   had occurred in a multi-million acre area.  Because of past sightings and because the entire

9   area contained appropriate habitat features, FWS determined that the MSO likely occupied

10  the area.  Id. at 53189.

11    In contrast, the present assessment focuses on a specific 40,000 acre Project area, of

12  which only 3,460 acres is within the critical habitat.  The FWS noted that there have been no

13  MSO sightings in the Project area in over 22 years.  Based on this information, FWS

14  determined that it was "extremely unlikely" that the MSO occurs in the Project area.  There

15  is no inconsistency between the two conclusions.  The determinations were made in different

16  contexts, considering different factors, for different purposes.  This is not competent evidence

17  that the FWS acted arbitrarily and capriciously.

18                **III**

19    Plaintiffs next argue that the Forest Service violated the National Forest Management

20  Act ("NFMA"), 16 U.S.C. § 1604(i), and the National Environmental Policy Act ("NEPA"),

21  42 U.S.C. § 4332(2)(C), by failing to adequately support its determination that the Project

22  is not likely to affect the viability of the Allen's lappet-browed bat.

23    The NFMA requires that site-specific projects are consistent with the applicable

24  Forest Plan.  16 U.S.C. § 1604(i).  The Kaibab Forest Plan requires the Forest Service to

25  prepare a biological evaluation "to document the effect of the selected action on the viability

26  of the population of the sensitive species."  FS AR doc. 14 at 738.  The biological evaluation

27  for the Warm Fire Project stated that the Allen's lappet-browed bat "occurs throughout most

28  of Arizona," and that the bat's habitat consists of "large, older ponderosa pine snags with

exfoliating bark for roosting sites." FS AR doc. 410 at 16035. The Forest Service concluded that the Project activities may disturb the bat's maternity colonies and "effect [sic] the local population of Allen's lappet-browed bats but is not likely to affect the population trend." Id. at 16066.

Plaintiffs contend that the Forest Service has not satisfied its NFMA obligations because it failed to properly analyze and document the effect of the Project on the viability of the bat population. According to plaintiffs, because the Forest Service knows little about the bat's population, trend, distribution, or post-fire habitat needs, its conclusion regarding population viability is unsupported and arbitrary. Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 963 (9th Cir. 2005) (the court must be able to "reasonably ascertain from the record that the Forest Service is in compliance with the [applicable] Plan standard").

Plaintiffs present the same challenge to the Forest Service's environmental impact statement. They argue that the Forest Service violated NEPA by failing to support its conclusions regarding bat population viability with objective data and analysis. See 40 C.F.R. § 1502.24. The EIS acknowledges that the Warm Fire Project may directly disturb the bat's maternity colonies, which may result in abandonment, and the "activities may effect [sic] the local population." The EIS concludes, however, that the Project is "not likely" to affect the bat's population trend. FS AR doc. 425 at 16513.

The Forest Service argues that there is no Forest Plan provision that requires it to know the population, population trend, or distribution of the bat. Instead, it claims that it has provided a detailed assessment documenting that the Project will not affect the viability of the bat population because it has shown that the number of snags that will remain after harvest will greatly exceed the Forest Plan standards.

The Ninth Circuit has held that the Forest Service may rely solely on habitat information in analyzing whether a project maintains species viability. The Lands Council v. McNair, 537 F.3d 981, 996 (9th Cir. 2008). The so-called "habitat by proxy approach," provides that a showing of a sustained suitable habitat operates as a "proxy for the viability of that species." Id. The Ninth Circuit found "eminently reasonable" the Forest Service's

1   conclusion that a project will maintain a viable population where it is shown that the project

2   will not decrease a habitat in the short-term and will promote the habitat in the long-term.

3   Id. Nevertheless, the Forest Service must "both describe the quantity and quality of habitat

4   that is necessary to sustain the viability of the species in question and explain its

5   methodology for measuring this habitat." Id. at 998.

6          The Forest Service has defined the quality of habitat as large snags with exfoliating

7   bark, and the quantity of habitat as the high-density or superabundance of snags that will

8   remain in the Project area. The Service has shown that the quantity of large snags is greater

9   than what has occurred historically and exceeds the Forest Plan requirements. The Forest

10  Service's biological evaluation contains detailed analyses comparing the pre-fire and post-

11  fire ecosystems in the Project area, including the amount of large snags that are present and

12  will be retained in the Project area. FS AR doc. 410 at 16012-18. Agency experts reported

13  that "[Forest] Plan guidelines will be followed to promote retention and recruitment of large

14  diameter snags to promote roosting sites [for female bats]." Id. at 16035. The Forest Service

15  reported that "[w]ith over 60 percent of the project area being classified as mixed-high to

16  high fire severity, the number of standing dead trees will greatly exceed the biological need

17  for any wildlife species." FS AR doc. 425 at 16480; see also FS AR doc. 410 at 16032

18  (noting over 352,000 snags >20" in the Project area). Moreover, the agency recognized that

19  because only a small portion of the Warm Fire area would be treated (23% of the Project

20  area), and because of the incorporation of project design features intended to ensure

21  favorable habitat conditions (leaving 3 to 5 snags per acre in ponderosa pine and 5 to 7 snags

22  per acre in mixed conifers), the Project will "provide for adequate snag habitat through the

23  next decade as these levels [of remaining snags] exceed what may have occurred

24  historically." FS AR doc. 425 at 16498-500.

25         We conclude that the Forest Service rationally concluded in both the biological

26  evaluation and the EIS that while some roosting bats might be disturbed by Project activities,

27  the overall population trend would not be adversely affected. Plaintiffs have failed to show

28

- 9 -

1  that the Forest Service's conclusion relating to the Project's effects on the bat population is

2  arbitrary and capricious.

3                                              **IV**

4        Finally, plaintiffs argue that the Forest Service's determination that leaving a

5  minimum of 15 to 20 tons per acre of coarse woody debris ("CWD," or material greater than

6  3 inches in diameter) in the Project area ignores its own scientific report, exceeds acceptable

7  limits, and results in extreme fire hazard.  See FS AR doc. 425 at 16383.  Specifically,

8  plaintiffs argue that the Forest Service ignored the 2003 "Brown Report's" suggestion that

9  the acceptable quantities of CWD should be reduced when combined with high levels of

10 small woody fuels (less than 3 inches in diameter).  FS AR doc. 105B at 5343.  They also

11 argue that the Forest Service failed to consider the size of the CWD that will remain onsite,

12 suggesting that the acceptable amount of CWD should be reduced when the CWD is small

13 (between 3 and 6 inches).  Plaintiffs argue that the Warm Fire EIS forecasts that under the

14 proposed plan, the CWD is above acceptable levels given the high level of small woody

15 debris present (as high as 24 tons per acre for up to 20 years), thereby creating an extreme

16 fire hazard.  FS AR doc. 425 at 16567-68.

17       The Forest Service contends that plaintiffs improperly focus on only one of several

18 factors relevant to CWD retention—fire hazard.  See FS AR doc. 105B at 5350.  Consistent

19 with the Brown Report and other scientific literature, however, the Forest Service calculated

20 the CWD retention standard based on the severity of the Warm Fire, the desire to protect

21 soils and provide wildlife habitat, as well as the goal of reducing the long-term fire hazard

22 in the Project area.  FS AR doc. 425 at 16361; FS AR doc. 426 at 16942, 16944.  It explains

23 that it chose the upper limit of the recommended range of CWD because much of the Project

24 treatment occurs in areas where moderate-high and high severity wildfire consumed most of

25 the organic matter on the forest floor, depriving the soil of necessary nutrients.  FS AR doc.

26 425 at 16352-54; FS AR doc. 105B at 5339.  The Forest Service contends that its CWD

27 determination is a compromise between reducing the long-term fire hazard while meeting the

28

ecosystem restoration objective of improving soil conditions and providing habitat benefits to wildlife.  FS AR doc. 391 at 15169.

Our review of an EIS under NEPA is "extremely limited."  <u>River Runners for Wilderness v. Martin</u>, 574 F.3d 723, 746 (9th Cir. 2009).  NEPA is a procedural statute.  Its "goal is satisfied once . . . information is properly disclosed; thus NEPA exists to ensure a process, not to ensure any result."  <u>Id.</u>  We review an EIS "only to determine whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the challenged action."  <u>Id.</u> (quotation omitted).  The Warm Fire EIS fully discloses and considers the relevant factors identified by the Brown Report.

V

In sum, we conclude that the FWS and the Forest Service have satisfied their respective obligations under the ESA, the NFMA, and the NEPA with respect to the Warm Fire Recovery Project. **IT IS THEREFORE ORDERED DENYING** plaintiffs' motion for summary judgment (doc. 16) and **GRANTING** defendants' cross motion for summary judgment (doc. 24).  **IT IS FURTHER ORDERED GRANTING** defendants' motion to strike with the exception of averments related to standing (doc. 28).

DATED this 4th day of November, 2009.

*Frederick J. Martone*

Frederick J. Martone
United States District Judge